Opinion by Judge CLIFTON; Dissent by Judge REINHARDT.
OPINION
CLIFTON, Circuit Judge:
Kenderick Begay appeals his convictions on two counts of first-degree murder in violation of 18 U.S.C. §§ 1111(a) and 1153(a), and two counts of using a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A). Begay’s principal argument on appeal is that the evidence introduced at trial, even when taken in the light most favorable to the prosecution, fails to establish that he acted with premeditation and thus fails to support his convictions for first-degree murder. We conclude that there was sufficient evidence to establish premeditation and affirm the convictions.
I. Background[1]
In the early morning hours of March 28, 2002, Kenderick Begay[2] drove his truck through the Navajo Indian Reservation[3] in Greasewood, Arizona, after leaving a gathering at the “windmill,” an area in town where the youth partied. His passengers included his sister Mecheryl Begay, Loren Clark, Emmanley Begay, and Jessica Lee. When a car passed them traveling in the opposite direction sometime around 2:00 a.m. or 3:00 a.m., Begay turned his truck around. The other car turned around as well. When the two vehicles passed each other again, Begay flashed the lights of his truck, a signal that resulted in stopping the other car. The two vehicles pulled off the highway and onto a dirt road. Begay got out of his truck and walked to the driver’s side of the other car. Two high school students, J.T. and O.C.,[4] were in the car; O.C. was in the driver’s seat and J.T. was in the front passenger’s seat.
After about a minute of standing by the driver’s side of the car, Begay walked back to his truck. He reached under the driver’s seat, pulled out a .30 caliber rifle, and walked back to the passenger’s side of the car. Begay shot eight or nine times through the passenger-side front window, shattering the glass. Six of the bullets hit J.T., while some of the shots missed, hitting the driver’s side door. One of the bullets that struck J.T. passed through him and hit O.C.
After firing the shots, Begay walked back to his truck and put the gun under *1041 the back seat. Clark, who had gotten out of the truck prior to the shooting to relieve himself, “just stood there” before asking, “What the hell are you doing?” Begay did not answer. His sister Mecheryl ran up to him making “horrible cries” and yelling at him, screaming, “What did you do?” or “Why did you do that?” Begay told her to be quiet. Clark walked over to the car and saw J.T. gasping for air and O.C. sitting in her seat. Clark again asked Begay why he shot the victims, but Begay did not respond.
Begay, Mecheryl, and Clark got back into the truck and drove away. Lee remained behind. Up until the shooting, she had been in a comatose state in the rear of the truck as a result of having consumed too much alcohol. The gunshots roused her from her stupor, at which point she felt an immediate need to vomit and exited the truck to do so. Lee did not reenter the vehicle following the shooting, but instead walked home from the crime scene. As she passed O.C.’s car, she saw O.C. trying to hold J.T. upright and saw that J.T.’s shirt was bloody.
O.C. managed to drive her car to a nearby housing area, where she sought help from Rosita Clark, Loren Clark’s mother. By the time O.C. and J.T. arrived, J.T. was already dead. O.C. was transported to a nearby hospital before being transferred to a hospital in Albuquerque, New Mexico, where she died from her wounds three days later.
FBI agents and Navajo investigators began to investigate the crime immediately. They interviewed numerous people, including Begay, who denied being out the night of the murders and stated that he had been with his girlfriend the entire time. Investigators learned from other sources, however, that Begay might have been at the party the victims attended. Approximately two weeks after the murders, investigators located the crime scene, where they found glass on the ground and six .30 caliber shell casings. After this discovery, the agents continued to investigate for several months but failed to make any further progress.
The investigation’s first break came six months after the shooting, in the autumn of 2002, when Jessica Lee contacted the FBI about the murders. She eventually told the FBI, and later testified at trial, that she had been present at the party and left with Begay, Mecheryl, Clark, and Emmanley. Lee admitted that alcohol impaired her memory, but stated that she remembered leaving the party with that group, that, after having passed out, she woke up at the sound of gunshots, and that she saw the victims after they had been shot. She also testified that a few days after the murders, she asked Begay what she should tell the police and that he told her to blame the murders on two other men. Lee and Begay never spoke about the murders again.
The next major development in the investigation came four years after the shooting, in May 2006, when the FBI contacted Clark. Other than Lee, Clark was the only percipient witness who testified at trial. Moreover, as Lee witnessed only the shooting’s aftermath, Clark was the sole witness to testify as to the events leading up to the shooting or the details of the shooting itself.
Clark testified that when the two cars pulled over, he exited Begay’s vehicle to relieve himself. Because he was standing at the rear of Begay’s truck while Begay was standing alongside the victim’s car, he could only see Begay “[f]rom quite a distance.” In fact, Clark described Begay as appearing as simply “a black figure” in the night. Clark testified that he saw Begay stand by the car for “just a minute or so” and then come “walking back ... to his truck.” Clark could not see what Begay *1042 retrieved from the truck, but saw that he “reached under the driver’s side ... seat,” retrieved something, and then returned to the victim’s car. At that point, according to Clark, he saw Begay lift the object that he had retrieved from the truck “up on his shoulder and just s[aw] — just s[aw] sparks.” Along with the sparks, Clark heard gunshots, which he recognized as coming from a rifle that Begay had used on previous occasions when he and Clark had gone shooting together. When the gunfire ceased, Clark asked Begay why he had shot the victims, but received no explanation. Instead, Begay told him to get back into the truck, which he did. Begay dropped Clark off at his house immediately following the murders and told him to keep quiet. The next morning, Begay told Clark to say nothing to the FBI and “to watch himself.” At various times following the murders, Begay told Clark to “watch his back.”
A jury convicted Begay on two counts of first-degree murder and two counts of using a firearm during a crime of violence. The district court imposed mandatory concurrent life sentences for each murder conviction as well as consecutive 120-month and 300-month sentences, or a total of thirty-five years, for the firearm convictions.
A three-judge panel of our court reversed Begay’s first-degree murder convictions, concluding that the evidence was insufficient for the jury to find that the killings had been premeditated. See United States v. Begay, 567 F.3d 540, 550 (9th Cir.2009). The panel decision affirmed the convictions for using a firearm during a crime of violence.
We granted the government’s petition for rehearing en banc. United States v. Begay, 591 F.3d 1180 (9th Cir.2010).
II. Sufficiency of the Evidence
Begay contends that the evidence of premeditation was insufficient to convict him of first-degree murder. Murder is defined in the relevant statute as follows:
Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.
Any other murder is murder in the second degree.
18 U.S.C. § 1111(a).
Premeditation is not required for all forms of first-degree murder, but it is undisputed that premeditation is a required element of first-degree murder as charged against Begay. Therefore, in this case, premeditation is the essential element that distinguishes first-degree and second-degree murder. See United States v. Quintero, 21 F.3d 885, 890 n. 3 (9th Cir.1994). Without proof of premeditation, Begay could not be convicted of first-degree murder.
The jury in this case was instructed, following our circuit’s model jury instructions, that
Premeditation means with planning or deliberation. The amount of time needed for premeditation of a killing depends on the person and the circumstances. It *1043 must be long enough, after forming the intent to kill, for the killer to have been fully conscious of the intent and to have considered the killing.
9th Cir. Model Crim. Jury Instr. 8.89 (2003). Begay did not object to that instruction at trial and has not done so in this appeal.
Premeditation can be proved by circumstantial evidence. United States v. Free, 841 F.2d 321, 325 (9th Cir.1988). Relevant circumstantial evidence includes but is not limited to “the defendant’s prior relationship to the victim, the defendant’s carrying of the murder weapon to the scene, and the manner of the killing.” Id.; see also 2 Wayne R. LaFave, Substantive Criminal Law § 14.7(a) (2d ed. 2009) (highlighting “planning activity,” “motive,” and the “nature of the killing” as probative evidence) (emphasis omitted).
Whether a defendant acted with premeditation is a factual question for the jury to decide. And a jury’s verdict is not to be disturbed lightly. As the Supreme Court established in Jackson v. Virginia, a challenge to the sufficiency of the evidence to support a criminal conviction requires us to determine whether, “after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
A unanimous en banc panel of our court recently held in United States v. Nevils, 598 F.3d 1158 (9th Cir.2010) (en banc), that Jackson established a two-step process:
First, a reviewing court must consider the evidence presented at trial in the light most favorable to the prosecution. This means that a court of appeals may not usurp the role of the finder of fact by considering how it would have resolved the conflicts, made the inferences, or considered the evidence at trial. Rather, when “faced with a record of historical facts that supports conflicting inferences” a reviewing court “must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.”
Second, after viewing the evidence in the light most favorable to the prosecution, the reviewing court must determine whether this evidence, so viewed, is adequate to allow “any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt.” This second step protects against rare occasions in which “a properly instructed jury may convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt.” More than a “mere modicum” of evidence is required to support a verdict. At this second step, however, a reviewing court may not “ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt,” only whether “any ” rational trier of fact could have made that finding.
Nevils, 598 F.3d at 1164 (citations, omissions, and alterations omitted) (quoting Jackson, 443 U.S. at 319-20, 326, 99 S.Ct. 2781).
We turn to the evidence presented at trial in this case. The first step under Nevils, requires us to consider the evidence in the light most favorable to the prosecution, resolving conflicts in favor of the government’s case. At least four pieces of evidence were relevant to whether Begay acted with planning or deliberation in killing his victims and whether there was sufficient time for him to plan or deliberate.
First, the jury could reasonably infer, from Loren Clark’s testimony, that Begay walked back to his truck after talking to *1044 O.C. and J.T., got a gun from under the back seat and then returned to shoot the victims. Carrying the murder weapon to the scene is strong evidence of premeditation. See Free, 841 F.2d at 325; United States v. Talbert, 710 F.2d 528, 531 (9th Cir.1983) (“If the jury determined that the killer picked up the murder weapon and carried it back seventy-five feet to [the victim’s] room, its finding of premeditation was justified.”); see also Belton v. United States, 382 F.2d 150, 152 (D.C.Cir.1967) (“[T]hat appellant entered the apartment with a loaded gun ... permitted an inference that appellant arrived on the scene already possessed of a calmly planned and calculated intent to kill.”). Leaving the scene to retrieve a weapon is even stronger evidence of premeditation because it suggests that Begay had formed a plan for committing the murders and then set about carrying it out.
Second, Clark testified that Begay walked both ways between his truck and O.C.’s car. There was no evidence that he was agitated or rushed. The jury could reasonably infer that he had enough time to become fully conscious of his intent to kill and to consider the killing.
Third, Clark testified that when Begay returned to O.C.’s car, he went to the passenger’s side, where J.T. was sitting, even though he had initially spoken to O.C. and J.T. from the driver’s side. The jury could reasonably infer that he did so to get a clearer shot at J.T. See Jackson, 443 U.S. at 325, 99 S.Ct. 2781 (“[T]he ... shots that killed the victim were fired at close, and thus predictably fatal, range by a person who was experienced in the use of the murder weapon.”). Like the defendant in Jackson, Begay fired from close range: Clark testified that Begay was at most four feet away from the car when he fired.
Finally, Clark testified that Begay did not answer when, after the shooting, Clark asked what he had done. He also testified that Begay’s sister, Mecheryl, yelled something like “What did you do?” to Begay at that point, and Begay told her to shut up and be quiet. The jury could reasonably infer that Begay was acting with a cool mind. Cf. id. at 325, 99 S.Ct. 2781 (“The petitioner’s calculated behavior both before and after the killing demonstrated that he was fully capable of committing premeditated murder.”).
The second step under Nevils requires us to consider whether this evidence, including the inferences drawn in the prosecution’s favor, was adequate to permit a rational juror to conclude that each essential element of the charge was proved beyond a reasonable doubt. This second step allows us to fulfill “our obligation under Jackson to identify those rare occasions in which ‘a properly instructed jury may convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt.’ ” Nevils, 598 F.3d at 1167 (omissions and alterations omitted) (quoting Jackson, 443 U.S. at 317, 99 S.Ct. 2781). For example, we cannot uphold a verdict where “mere speculation, rather than reasonable inference, supports the government’s case.” Nevils, 598 F.3d at 1167 (citing Juan H. v. Allen, 408 F.3d 1262, 1277-79 (9th Cir.2005)).
The evidence we described in step one, viewed in the light most favorable to the prosecution, was sufficient for a rational juror to conclude that Begay acted with planning or deliberation in shooting J.T. and that he had enough time to do so.[5] *1045 Each of the inferences we described is reasonable because it is “supported by a chain of logic,” which is all that is required to distinguish reasonable inference from speculation. Juan H., 408 F.3d at 1277. In this case, therefore, step two is simple. Nothing more was needed for a rational juror to conclude beyond a reasonable doubt that Begay acted with premeditation.[6]
Begay argues that because there was no evidence presented at trial to establish a motive on the part of Begay to kill J.T. or O.C. or to prove that Begay had a prior relationship with them, it would have been irrational for a juror to conclude that Begay premeditated the killings. But although evidence of motive or of a past relationship often helps to establish a given defendant’s guilt, neither motive nor a past relationship is an element of first-degree murder. See United States v. Brown, 880 F.2d 1012, 1014 (9th Cir.1989); see also 18 U.S.C. § 1111(a).
A rational juror could have concluded beyond a reasonable doubt from the evidence concerning Begay’s activity and the manner of killing that Begay acted with premeditation. See Free, 841 F.2d at 325; LaFave, supra, § 14.7(a). Begay does not contest the sufficiency of evidence as to any other element of first-degree murder. The evidence was therefore sufficient to support the jury’s verdict and the convictions for first-degree murder.
III. Other Challenges
Begay raises a number of other arguments that we can address without extended discussion. None persuades us to reverse the conviction or to remand for any further proceedings.
A Voluntary Manslaughter Instruction
Begay argues that the district court erred by declining to instruct the jury on the lesser crime of voluntary manslaughter. See 18 U.S.C. § 1112(a); United States v. Paul, 37 F.3d 496, 499 (9th Cir.1994). We review the refusal to instruct on a lesser included offense for abuse of discretion. See United States v. Naghani, 361 F.3d 1255, 1262 (9th Cir.2004). A murder defendant is not automatically entitled to a voluntary manslaughter instruction. The defendant must produce evidence “that the defendant was acting out of passion rather than malice” before the burden shifts to the government to “prove beyond a reasonable doubt the absence of sudden quarrel or heat of passion.” Quintero, 21 F.3d at 890 (citing United States v. Lesina, 833 F.2d 156, 160 (9th Cir.1987)). Begay relies on United States v. Hernandez, 476 F.3d 791 (9th Cir.2007), but that case is inapposite. In Hernandez, the evidence at trial was sufficient to allow a rational jury to find the defendant guilty of a lesser included offense, so the defendant had no obligation to introduce additional evidence. See id. at 801. Here, Begay’s trial counsel conceded that there was no evidence of provocation. Begay failed to meet his burden of production, so the district court did not abuse its discretion by refusing to give the requested instruction. See United States *1046 v. Wagner, 834 F.2d 1474, 1487 (9th Cir.1987).

B. Evidence of Witness Intimidation

Begay argues that evidence showing that he sought to intimidate the witnesses against him was inadmissible under Federal Rules of Evidence 403 and 404(b). Specifically, Begay challenges the admission of Clark’s testimony that he was afraid to talk to investigators after Begay told him to keep quiet and to watch himself. He also challenges Jessica Lee’s testimony that Begay told her to blame the murders on other people. Because Begay did not object to this evidence at trial, we review for plain error. See United States v. Banks, 514 F.3d 959, 975-76 (9th Cir.2008). There was no error. First, the evidence in question was admissible to show Begay’s consciousness of guilt. See Ortiz-Sandoval v. Gomez, 81 F.3d 891, 897 (9th Cir.1996). Second, its probative value outweighed any danger of unfair prejudice because the evidence also tended to explain why Clark and Lee delayed coming forward to investigators until they each had moved away from Greasewood.
Begay also contends that he was not given reasonable notice by the government that it would introduce this evidence of his other wrongful acts. The government was not required to provide such notice unless Begay requested it. See Fed.R.Evid. 404(b) (duty triggered “upon request by the accused”); United States v. Vega, 188 F.3d 1150, 1154 (9th Cir.1999). Begay cites no request for notice, and our review of the record has not revealed one. Even if Begay did request notice and the government failed to provide it, the decision to admit the evidence does not require reversal. We recognize plain errors only if they seriously undermine “the fairness, integrity, or public reputation of judicial proceedings.” United States v. Cruz-Perez, 567 F.3d 1142, 1146 n. 1 (9th Cir.2009). That did not happen here: The government disclosed the evidence itself and said specifically in its opening statement that some of it would be introduced. The defense had an opportunity to cross-examine the government’s witnesses about the evidence. And the district court had no reason to suspect a notice problem absent an objection.

C. Prosecutorial Misconduct

Begay argues that the prosecutor committed misconduct by misstating the elements of first-degree murder during closing argument. We review the prosecutor’s statement for plain error because no objection was raised at trial. See United States v. Romero-Avila, 210 F.3d 1017, 1021-22 (9th Cir.2000).
The prosecutor made the following statement, which Begay insists is a justification for a new trial:
He knew exactly what he was doing. He intended to kill the occupants of the vehicle. That’s premeditation. He intended it. He was conscious of it. That’s first degree murder.
The prosecutor did make a mistake in saying “that’s premeditation” right after she said “he intended to kill the occupants of the vehicle.” Intent is not the same thing as premeditation. But we consider the misstatement in context. The court properly instructed the jury on the correct definition, and an instruction carries more weight than an argument. Boyde v. California, 494 U.S. 370, 384-85, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990); see also Weeks v. Angelone, 528 U.S. 225, 234, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000) (holding that a jury is presumed to follow a judge’s instructions). Plus, the prosecutor correctly stated the law shortly before the misstatement, explaining that “ ‘[premeditation’ means planning or deliberation. The amount of time needed ... must be *1047 long enough after forming the intent to kill for the killer to have been fully conscious of the intent and to have considered the killing.” The misstatement did not prejudice Begay, so there was no plain error. See United States v. Medina-Casteneda, 511 F.Sd 1246, 1249-50 (9th Cir.2008).

D. Cumulative Error

Begay argues that the cumulative effect of the issues he raises deprived him of a fair trial. We have not recognized any error below, so there is no cumulative prejudicial effect to analyze. See, e.g., United States v. Jeremiah, 498 F.3d 1042, 1047 (9th Cir.2007).
IV. Conclusion
The evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational juror to conclude that Kenderick Begay acted with premeditation in killing his victims. His other arguments also lack merit.
AFFIRMED.

. Most of the background section of this opinion is drawn directly from the opinion of the three-judge panel that initially heard this case. See United States v. Begay, 567 F.3d 540 (9th Cir.2009).

. The record reflects that "Begay” is a common surname in the Navajo Nation and does not always reflect a familial relation between two individuals bearing that name. In this case, four relevant parties bear the surname Begay: the defendant, his sister Mecheryl, a man named Emmanley, and a man named Larry. The latter two bear no familial relation to the first two or to each other. We refer to the defendant by his surname and to the other Begays by either their first or full names.

. Begay was charged under the federal murder statute pursuant to the Indian Major Crimes Act, 18 U.S.C. § 1153, which extends federal criminal jurisdiction to cover specific crimes, including murder, committed by Indians in Indian Country.

. Because the victims were minors, we refer to them using only their initials. See 18 U.S.C. § 3509(d).

. The evidence was sufficient to conclude that Begay premeditated killing J.T., so it was not necessary for the jury to decide separately whether Begay also premeditated killing O.C., his other victim. See 18 U.S.C. § 1111(a) ("Every murder ... perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed ... is murder in the first degree.”).

. While we have examined several pieces of evidence to determine whether the evidence as a whole was sufficient to support Begay's conviction, we do not mean to imply that the evidence would have been insufficient in the absence of any of these pieces. Nor do we mean to imply that the evidence in this case represents a minimum level of evidence for the government to produce in other cases involving premeditation. The analysis under Jackson and Nevils must be applied to each criminal appeal in which the sufficiency of evidence is at issue. Whether the evidence in a given case is sufficient to prove an element of a crime always depends on the specific evidence produced in that case.